## Taylor v. Commonwealth.

(Decided May 11, 1937.)

658

HUBERT MEREDITH, Attorney General, and J. M. CAMPBELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Affirming.

Under an indictment charging Charlie Taylor and Jeff Taylor with the murder of Shirley Johnson, Jeff Taylor on separate trial has been found guilty of voluntary manslaughter and sentenced to imprisonment for twenty-one years. He is appealing.

It is first argued by counsel for appellant that the instructions given are erroneous and that the whole law of the case was not given. A brief summary of the facts is necessary to a proper understanding of the various questions raised concerning instructions given and instructions that it is claimed should have been given. Appellant and his wife and daughter lived in Noetown, a rather thickly populated suburb of Middlesboro. His son Charlie lived in the same community. It appears that some time prior to the homicide, for reasons not disclosed in the record, some boys had hollowed "hooey" at appellant or members of his family and thereby incurred his displeasure. His open resentment of this conduct upon the part of the boys, including deceased, who was about eighteen years of age, apparently encouraged them to persist in it. On the night before

the homicide while appellant's wife and daughter were on their way to church, as they and others testified, deceased and a number of young companions again annoyed them by hollowing "hooey." Appellant accosted the offenders and asked them to refrain from thus annoying members of his family, stating that his wife was recovering from an illness and that their conduct disturbed her. Deceased and others promised not to repeat the offense, however, there is evidence pro and con concerning threats that passed. On the evening of January 30, 1936, appellant, his wife, and daughter and his son, Charlie, who had come to his home, decided, as they testified, to go to a nearby store to make some purchases. Mrs. Taylor and her son and daughter started out ahead of appellant who remained to lock up the house. A short distance from the house and before appellant had caught up with them they met Thornton Wilson and Claude Ellis who lived in the neighborhood. It seems they were under the impression that Claude Ellis was one of the boys who had been annoying them and they spoke to him about it, but he protested his innocence and apologies were made. According to the evidence for the commonwealth, deceased who was some distance away when the Taylors met and stopped to talk with Claude Ellis and Wilson said to a young companion, "Let's go up and see what they are doing to Duke," referring to Claude Ellis. He walked up to the crowd and before he had said anything or made any demonstration, appellant walked up behind him, grabbed him by the arm, and in a struggle that ensued he was heard to cry out as if in pain and immediately some shots followed. The evidence for the commonwealth indicates that both appellant and deceased fired shots. Deceased started to run away, followed by appellant and Charlie Taylor, the latter firing at him with a 45 pistol. He had run about 60 feet when he fell mortally wounded. One bullet had entered the back of his head and lodged under the skin of the forehead, and four other shots had entered his back. On the following morning the coroner removed the bullet from under the skin of the forehead and it was introduced in evidence and is filed as an exhibit with the record. The coroner testified on the trial that from an examination of the bullet it was from a 38 special cartridge. He admitted, however, that he gave as his opinion on the examining trial that it was a 45, but testified that after examining it and trying it in the shells of 45 and 38 special cartridges, he was convinced

that it was a 38 special. It is admitted that Charlie Taylor had a 45 caliber pistol and that all the shooting done by him in the affray was with this pistol. Appellant admitted that he owned a 38 caliber pistol, but testified that he left it at home when he started to the store and did not have it during the difficulty, but that immediately after the shooting was over he went back to the house and got his pistol and later returned to the scene with it. According to the evidence of appellant and his witnesses, he came up where his family was talking with Ellis before deceased arrived and that deceased then came up between him and the others, turned facing him and immediately started firing at him, one of the bullets striking him in the chin; that he started backing away with deceased following him and then Charlie Taylor drew his pistol and began firing at deceased and continued doing so until he fell dead. The evidence shows that appellant did receive a gunshot wound in the lower part of his face. It is also shown that there were some bruises or abrasions on the face of deceased. More will be said of the evidence in a discussion of points argued by counsel for appellant.

It is admitted by counsel for appellant that since he was found guilty of manslaughter he could not complain of the first and second instructions which authorize a conviction of willful murder if appellant himself fired the fatal shots in circumstances that would constitute murder or if he aided and abetted Charlie Taylor in firing the fatal shot or shots in such circumstances. However, they do ask that in the event of a reversal, the lower court should be directed on another trial to omit certain language used in instruction 2. It is pointed out that instructions following instruction 2 make no reference to aiding and abetting and do not submit the right of appellant to act in defense of members of his family. As a matter of course, if Charlie Taylor shot and killed deceased in circumstances that would constitute voluntary manslaughter and appellant had aided and abetted him in so doing, an instruction on that phase of the case should have been given, but whether such instruction was authorized in this instance is immaterial since in any event it was to appellant's advantage that it should not be given. Under the instructions given, he could be convicted of manslaughter only in the event the jury believed that he actually fired the fatal shot and could not be convicted of manslaugh-

ter as an aider and abetter even though the jury believed that Charlie Taylor fired the shots in circumstances that would authorize conviction for manslaughter and that appellant aided and abetted in so doing.

The contention that an instruction embodying the right of appellant to shoot in defense of members of his family is based on evidence of some witness or witnesses that as deceased approached the scene of the difficulty he had his hand upon his pistol or in a pocket where he carried the pistol and that he had been threatening to do violence to appellant; but there is no evidence that he ever threatened to assault or attempted any violence toward appellant's wife, son, or daughter. It is therefore manifest that the instructions were not erroneous in any of the particulars mentioned; and, without going into further detail, we deem it sufficient to say that the instructions as given, clearly, fully, and fairly presented to the jury the issues made by proof.

It is next argued that in the opening statement of the case, attorneys for the commonwealth made statements highly prejudicial to appellant. In the opening statement, the county attorney stated in substance that on the evening of the homicide or the previous evening, Mrs. Taylor and her daughter went to the home of the father of deceased and said to him, "Jeff and Charlie are going to kill your boy tonight." Counsel for defendant interposed an objection to this statement and the court thereupon admonished the attorney to state only the competent evidence that would be offered and to confine his statement to that character of evidence. The commonwealth excepted to the court's admonition and ruling, but the defendant saved no exception. Evidence as to what others said out of the presence of appellant would, of course, be incompetent; but when on objection the court promptly stopped counsel and admonished him to confine his statements solely to competent evidence, any unfavorable impression made by this statement was overcome. Not only so, but the failure to save exceptions precluded appellant from relying on this alleged error.

It is further argued that the court erred in not permitting Mrs. Minerva Alston, a witness introduced by appellant, to answer questions concerning an alleged conversation she had with the father of deceased on the evening of the homicide. On cross-examination Mr. Johnson was asked if he had made a statement to Mr.

and Mrs. Alston that he had taken one pistol away from his son, but the son later procured another and that if his son had had the pistol which was taken away .from him he would surely have killed Jeff Taylor. The court sustained objection to the question and did not permit the witness to answer. It certainly requires no argument to demonstrate that this evidence was incompetent and irrelevant and the court properly refused to later permit Mrs. Alston to testify concerning such conversation. It is also insisted that the court erred in refusing to permit Mrs. Alston to testify that Mr. Johnson said he was in front of the police office and not at home when his son was killed. The court properly refused to admit this evidence because in the circumstances it was immaterial where Mr. Johnson was at the time.

A number of witnesses were called who testified to the good character of appellant. On cross-examination one of the witnesses who had testified to the good reputation of appellant for morality, etc., was asked if he knew that a house of ill fame was kept right there by Nettie Taylor in the house. Counsel for defendant interposed an objection and moved the court to set aside the swearing of the jury and continue the case, and counsel for the commonwealth then asked whether or not a part of the general reputation of Jeff Taylor was that an improper house was conducted in his home by his daughter, Nettie Taylor. The court sustained objection to the question and admonished the jury not to consider it. It is urged that the asking of this question was highly prejudicial to appellant. The case of Black v. Commonwealth, 240 Ky. 620, 42 S. W. (2d) 883, is cited. In that case witnesses who testified to the good reputation of accused for peace and quietude on cross-examination were asked a number of questions, such as whether they heard a lot of shooting up at his house, and whether they had heard he was a bootlegger and like questions, to which the witnesses replied in the negative. As pointed out in that opinion, when a witness has testified that another bears a good reputation, he may be asked about facts that would affect the weight of his testimony in that respect, but such evidence should be admitted cautiously and within a very narrow limit and indicates that such questions asked for the mere purpose of casting insinuations were highly prejudicial and should not be permitted. In view of the

prompt admonition of the court, it is obvious that the jury could not have been unduly influenced by the asking of this question when it was not persisted in after the court sustained objections.

A number of other rulings of the court in the admission and rejection of evidence are called in question by counsel for appellant, but we have recounted those most seriously argued and which apparently furnish any basis for claim of error. It is also argued that the court in passing on questions of evidence made many prejudicial statements in the hearing of the jury. We have carefully read and considered the record in connection with brief for appellant, and find nothing to justify a conclusion that prejudicial error was committed in the particulars indicated. On the other hand, we have been impressed with the manifest fairness of the court and his apparent endeavor to afford to appellant the fair and impartial trial to which he was entitled.

Complaint is made that the court erred in overruling appellant's motion to set aside the swearing of the jury and continue the case because of crying and screaming of some relatives of deceased when his clothes were introduced in evidence. The transcript discloses that when the clothing worn by deceased at the time of his death was about to be exhibited to the jury, two women in the courtroom began to weep and scream. The court immediately directed the sheriff to take them out of the courtroom, and not allow them to return until they could control their emotions and stated that there would be no demonstration in the courtroom and he wanted that to be understood by all present. Motion thereupon made by counsel to set aside the swearing of the jury and continue the case was overruled, but gave this admonition:

"Gentlemen of the jury, the crying of these women here must be entirely disregarded by you. You are not to try the case on anything of that kind. The jury is expected to be calm and dispassionate and to try the case solely on the evidence and the instructions of the court which will be given to you. That is the guiding star that is to control your actions and nothing else."

Show of emotions by relatives of the deceased in homicide cases is not unusual, and that is a matter difficult to control, since the relatives have a right to come into

the courtroom, but in view of the prompt action of the court in having the women removed and his statement voicing disapproval of such outbursts, it is inconceivable that this incident could have prejudiced the minds of a competent juror or had any effect in determining a verdict.

Argument that appellant was denied sufficient time to present his evidence and develop his defense appears to have been made for the first time in this court, since it was not made a ground for new trial. Even if it had been a ground for new trial, there is nothing to be found in the record that would indicate any merit in it. It is not shown that appellant was denied the privilege of introducing any evidence he desired to.

Claim that appellant was taken by surprise in the change of position by the commonwealth when evidence was introduced to the effect that the bullet which penetrated the head of deceased was a 38 caliber, the same witnesses on examining trial having expressed an opinion that the bullet introduced in evidence was of 45 caliber. This was not a ground for new trial, but if it had been, it would have been of no avail, since claim of surprise urged for the first time in motion and ground for new trial comes too late. Wolff v. Commonwealth, 211 Ky. 62, 276 S. W. 1067. It is the duty of a defendant when surprised by evidence for the commonwealth to at once make it known to the court, and by appropriate motion and showing of necessary facts apply for a continuance, and not to await the final result of the trial and then for the first time urge surprise as a ground for new trial. Roark v. Commonwealth, 221 Ky. 253, 298 S. W. 683; Dennison v. Commonwealth, 198 Ky. 376, 248 S. W. 878; Burk v. Commonwealth, 260 Ky. 304, 84 S. W. (2d) 1019.

Finally it is argued that appellant was entitled to a new trial on the ground of newly discovered evidence. In support of this ground, he filed his own affidavit and that of the newly discovered witness which are to the effect that the witness was present when the coroner took the bullet out of the forehead of deceased and that in addition to the bullet introduced in evidence the coroner also took out another piece or sliver of the bullet. It is earnestly argued that the turning point in the case was the evidence of the coroner that the bullet in question was of 38 caliber, hence the importance of the evidence of the newly discovered witness which would tend

to show that it was a larger bullet. The opinion of the coroner as to the caliber of the bullet was based on the neck or that part of the bullet which fits into the shell. In addition to the battered bullet, there was introduced in evidence a shell of both 38 and 45 caliber cartridges and also cartridges of 38 and 45 caliber. The coroner testified that he changed his opinion as to the caliber of the bullet after comparing the neck of it with the 38 and 45 caliber shells and that it fit loosely into the larger shell. Witnesses for appellant who claimed to be expert in the matter of firearms, bullets, etc., gave as their opinion that the battered shell introduced in evidence was a 45, so there was a conflict in evidence on that point. Ordinarily, a new trial will not be granted on newly discovered evidence that is merely cumulative or impeaching in its nature and newly discovered evidence of such character is insufficient as a ground for new trial unless it is of such a decisive nature as to make a different result reasonably certain. Phillips v. Commonwealth, 248 Ky. 643, 59 S. W. (2d) 552. It is an established rule that to authorize a new trial the alleged newly discovered evidence must be of such a nature and character as to indicate that it might or probably would produce a different result at another trial. Belcher v. Commonwealth, 247 Ky. 831, 57 S. W. (2d) 988. From a consideration of matters set out in the affidavits in connection with the evidence introduced on the trial, it is manifest that the alleged newly discovered evidence is not of such a character as would have a controlling effect or that a different verdict would have been reached if the witness had been present and testified to the facts stated in his affidavit. There are affidavits of other witnesses filed with the motion and grounds for new trial, but they relate to statements made by some witness after the trial. We find no reference to this matter in the motion for new trial, nor do we find anything in these affidavits that would warrant the granting of a new trial on the ground of newly discovered evidence.

It has been a subject of comment in this court that few if any hard fought cases of this character are tried without some minor errors or irregularities creeping into the record, but not all errors or irregularities will warrant a reversal. To authorize a reversal, it must affirmatively appear that some error was committed prejudicial to the substantial right of accused (section

340, Criminal Code of Practice, and cases thereunder cited), and upon a consideration of the record as a whole we find no such error.

Judgment affirmed.